Justice THOMAS, concurring.
Indiana law prohibits abortion providers from treating the bodies of aborted children *1783 as "infectious waste" and incinerating them alongside used needles, laboratory-animal carcasses, and surgical byproducts. Ind. Code § 16-41-16-4(d) (2019) ; see §§ 16-41-16-2, 16-41-16-4, 16-41-16-5 ; Ind. Admin. Code, tit. 410, §§ 35-1-3, 35-2-1(a)(2) (2019). A panel of the Seventh Circuit held that this fetal-remains law was irrational, and thus unconstitutional, under the doctrine of "substantive due process." That decision was manifestly inconsistent with our precedent, as the Court holds.[1] I would have thought it could go without saying that nothing in the Constitution or any decision of this Court prevents a State from requiring abortion facilities to provide for the respectful treatment of human remains.
I write separately to address the other aspect of Indiana law at issue here-the "Sex Selective and Disability Abortion Ban." Ind. Code § 16-34-4-1 et seq. This statute makes it illegal for an abortion provider to perform an abortion in Indiana when the provider knows that the mother is seeking the abortion solely because of the child's race, sex, diagnosis of Down syndrome, disability, or related characteristics. §§ 16-34-4-1 to 16-34-4-8 ; see § 16-34-4-1(b) (excluding "lethal fetal anomal[ies]" from the definition of disability). The law requires that the mother be advised of this restriction and given information about financial assistance and adoption alternatives, but it imposes liability only on the provider. See §§ 16-34-2-1.1(a)(1)(K), (2)(A)-(C), 16-34-4-9. Each of the immutable characteristics protected by this law can be known relatively early in a pregnancy, and the law prevents them from becoming the sole criterion for deciding whether the child will live or die. Put differently, this law and other laws like it promote a State's compelling interest in preventing abortion from becoming a tool of modern-day eugenics.[2]
The use of abortion to achieve eugenic goals is not merely hypothetical. The foundations for legalizing abortion in America were laid during the early 20th-century birth-control movement. That movement developed alongside the American eugenics movement. And significantly, Planned Parenthood founder Margaret Sanger recognized the eugenic potential of her cause. She emphasized and embraced the notion that birth control "opens the way to the eugenist." Sanger, Birth Control and Racial Betterment, Birth Control Rev., Feb. 1919, p. 12 (Racial Betterment). As a means of reducing the "ever increasing, *1784 unceasingly spawning class of human beings who never should have been born at all," Sanger argued that "Birth Control ... is really the greatest and most truly eugenic method" of "human generation." M. Sanger, Pivot of Civilization 187, 189 (1922) (Pivot of Civilization). In her view, birth control had been "accepted by the most clear thinking and far seeing of the Eugenists themselves as the most constructive and necessary of the means to racial health." Id. , at 189.
It is true that Sanger was not referring to abortion when she made these statements, at least not directly. She recognized a moral difference between "contraceptives" and other, more "extreme" ways for "women to limit their families," such as "the horrors of abortion and infanticide." M. Sanger, Woman and the New Race 25, 5 (1920) (Woman and the New Race). But Sanger's arguments about the eugenic value of birth control in securing "the elimination of the unfit," Racial Betterment 11, apply with even greater force to abortion, making it significantly more effective as a tool of eugenics. Whereas Sanger believed that birth control could prevent "unfit" people from reproducing, abortion can prevent them from being born in the first place. Many eugenicists therefore supported legalizing abortion, and abortion advocates-including future Planned Parenthood President Alan Guttmacher-endorsed the use of abortion for eugenic reasons. Technological advances have only heightened the eugenic potential for abortion, as abortion can now be used to eliminate children with unwanted characteristics, such as a particular sex or disability.
Given the potential for abortion to become a tool of eugenic manipulation, the Court will soon need to confront the constitutionality of laws like Indiana's. But because further percolation may assist our review of this issue of first impression, I join the Court in declining to take up the issue now.
I
The term "eugenics" was coined in 1883 by Francis Galton, a British statistician and half-cousin of Charles Darwin. See S. Caron, Who Chooses?: American Reproductive History Since 1830, p. 49 (2008); A. Cohen, Imbeciles: The Supreme Court, American Eugenics, and the Sterilization of Carrie Buck 46 (2016) (Imbeciles). Galton described eugenics as "the science of improving stock" through "all influences that tend in however remote a degree to give to the more suitable races or strains of blood a better chance of prevailing speedily over the less suitable than they otherwise would have." F. Galton, Inquiries Into Human Faculty and Its Development 25, n. 1 (1883). Eugenics thus rests on the assumption that "man's natural abilities are derived by inheritance, under exactly the same limitations as are the form and physical features of the whole organic world." F. Galton, Hereditary Genius: An Inquiry Into Its Laws and Consequences 1 (1869) (Hereditary Genius); see Imbeciles 46-47. As a social theory, eugenics is rooted in social Darwinism-i.e. , the application of the "survival of the fittest" principle to human society. Caron, supra , at 49; Imbeciles 45. Galton argued that by promoting reproduction between people with desirable qualities and inhibiting reproduction of the unfit, man could improve society by "do[ing] providently, quickly, and kindly" "[w]hat Nature does blindly, slowly, and ruthlessly." F. Galton, Eugenics: Its Definition, Scope and Aims, in Essays in Eugenics 42 (1909).
By the 1920s, eugenics had become a "full-fledged intellectual craze" in the United States, particularly among progressives, professionals, and intellectual elites. Imbeciles 2; see id. , at 2-4, 55-57; Cohen, Harvard's *1785 Eugenics Era, Harvard Magazine, pp. 48-52 (Mar.-Apr. 2016) (Harvard's Eugenics Era). Leaders in the eugenics movement held prominent positions at Harvard, Stanford, and Yale, among other schools, and eugenics was taught at 376 universities and colleges. Imbeciles 4; see also Harvard's Eugenics Era 48. Although eugenics was widely embraced, Harvard was "more central to American eugenics than any other university," with administrators, faculty members, and alumni "founding eugenics organizations, writing academic and popular eugenics articles, and lobbying government to enact eugenics laws." Ibid. ; see id. , at 49-52. One Harvard faculty member even published a leading textbook on the subject through the Harvard University Press, Genetics and Eugenics. Id. , at 49.
Many eugenicists believed that the distinction between the fit and the unfit could be drawn along racial lines, a distinction they justified by pointing to anecdotal and statistical evidence of disparities between the races. Galton, for example, purported to show as a scientific matter that "the average intellectual standard of the negro race is some two grades below" that of the Anglo-Saxon, and that "the number among the negroes of those whom we should call half-witted men, is very large." Hereditary Genius 338-339. Other eugenicists similarly concluded that "the Negro ... is in the large eugenically inferior to the white" based on "the relative achievements of the race" and statistical disparities in educational outcomes and life expectancy in North America, among other factors. P. Popenoe & R. Johnson, Applied Eugenics 285 (1920) (Applied Eugenics); see id. , at 280-297 (elaborating on this view); see also, e.g. , R. Gates, Heredity and Eugenics 234 (1923) (citing disparities between white and black people and concluding that "the negro's mental status is thus undoubtedly more primitive than that of the white man"); Hunt, Hand, Pettis, & Russell, Abstract, Family Stock Values in White-Negro Crosses: A Note on Miscegenation, 8 Eugenical News 67 (1923) ("Experiments, as well as general experience, indicate that the average inborn intelligence of the white man is considerably higher than that of the negro").
Building on similar assumptions, eugenicist Lothrop Stoddard argued that the "prodigious birth-rate" of the nonwhite races was bringing the world to a racial tipping point. L. Stoddard, The Rising Tide of Color Against White World-Supremacy 8-9 (1920). Stoddard feared that without "artificial barriers," the races "will increasingly mingle, and the inevitable result will be the supplanting or absorption of the higher by the lower types." Id. , at 302. Allowing the white race to be overtaken by inferior races, according to Stoddard, would be a tragedy of historic proportions:
"[T]hat would mean that the race obviously endowed with the greatest creative ability, the race which had achieved most in the past and which gave the richer promise for the future, had passed away, carrying with it to the grave those potencies upon which the realization of man's highest hopes depends. A million years of human evolution might go uncrowned, and earth's supreme life-product, man, might never fulfil his potential destiny. This is why we today face 'The Crisis of the Ages.' " Id. , at 304.
Eugenic arguments like these helped precipitate the Immigration Act of 1924, which significantly reduced immigration from outside of Western and Northern Europe. §§ 11(a)-(b), 43 Stat. 159; Imbeciles 126-135; see also id. , at 135 (discussing the difficulties the Act created for many Jews seeking to flee Nazism). The *1786 perceived superiority of the white race also led to calls for race consciousness in marital and reproductive decisions, including through antimiscegenation laws. Applied Eugenics 296 ("We hold that it is to the interests of the United States ... to prevent further Negro-white amalgamation").
Although race was relevant, eugenicists did not define a person's "fitness" exclusively by race. A typical list of dysgenic individuals would also include some combination of the "feeble-minded," "insane," "criminalistic," "deformed," "crippled," "epileptic," "inebriate," "diseased," "blind," "deaf," and "dependent (including orphans and paupers)." Imbeciles 139; see Applied Eugenics 176-183; cf. G. Chesterton, Eugenics and Other Evils 61 (1922) ("[F]eeble-mindedness is a new phrase under which you might segregate anybody" because "this phrase conveys nothing fixed and outside opinion"). Immigration policy was insufficient to address these "danger[s] from within," Imbeciles 4, so eugenicists turned to other solutions. Many States adopted laws prohibiting marriages between certain feebleminded, epileptic, or other "unfit" individuals, but forced sterilization emerged as the preferred solution for many classes of dysgenic individuals. Id. , at 63, 66. Indiana enacted the first eugenic sterilization law in 1907, and a number of other States followed suit. Id. , at 70.
This Court threw its prestige behind the eugenics movement in its 1927 decision upholding the constitutionality of Virginia's forced-sterilization law, Buck v. Bell , 274 U. S. 200, 47 S.Ct. 584, 71 L.Ed. 1000. The plaintiff, Carrie Buck, had been found to be "a feeble minded white woman" who was "the daughter of a feeble minded mother ... and the mother of an illegitimate feeble minded child." Id. , at 205, 47 S.Ct. 584.[3] In an opinion written by Justice Oliver Wendell Holmes, Jr., and joined by seven other Justices, the Court offered a full-throated defense of forced sterilization:
"We have seen more than once that the public welfare may call upon the best citizens for their lives. It would be strange if it could not call upon those who already sap the strength of the State for these lesser sacrifices, often not felt to be such by those concerned, in order to prevent our being swamped with incompetence. It is better for all the world, if instead of waiting to execute degenerate offspring for crime, or to let them starve for their imbecility, society can prevent those who are manifestly unfit from continuing their kind. The principle that sustains compulsory vaccination is broad enough to cover cutting the Fallopian tubes. Three generations of imbeciles are enough." Id. , at 207, 47 S.Ct. 584 (citation omitted).
The Court's decision gave the eugenics movement added legitimacy and considerable momentum; by 1931, 28 of the Nation's 48 States had adopted eugenic sterilization laws. Imbeciles 299-300. Buck was one of more than 60,000 people who were involuntarily sterilized between 1907 and 1983. Id. , at 319.
Support for eugenics waned considerably by the 1940s as Americans became familiar with the eugenics of the Nazis and scientific literature undermined the assumptions on which the eugenics movement was built. But even today, the Court continues to attribute legal significance to the same types of racial-disparity evidence that were used to justify race-based eugenics.
*1787 See T. Sowell, Discrimination and Disparities 5-6 (rev. ed. 2019) (Sowell).[4] And support for the goal of reducing undesirable populations through selective reproduction has by no means vanished.
II
This case highlights the fact that abortion is an act rife with the potential for eugenic manipulation. From the beginning, birth control and abortion were promoted as means of effectuating eugenics. Planned Parenthood founder Margaret Sanger was particularly open about the fact that birth control could be used for eugenic purposes. These arguments about the eugenic potential for birth control apply with even greater force to abortion, which can be used to target specific children with unwanted characteristics. Even after World War II, future Planned Parenthood President Alan Guttmacher and other abortion advocates endorsed abortion for eugenic reasons and promoted it as a means of controlling the population and improving its quality. As explained below, a growing body of evidence suggests that eugenic goals are already being realized through abortion.
A
Like many elites of her day, Sanger accepted that eugenics was "the most adequate and thorough avenue to the solution of racial, political and social problems." Sanger, The Eugenic Value of Birth Control Propaganda, Birth Control Rev., Oct. 1921, p. 5 (Propaganda). She agreed with eugenicists that "the unbalance between the birth rate of the 'unfit' and the 'fit' " was "the greatest present menace to civilization." Ibid. Particularly "in a democracy like that of the United States," where "[e]quality of political power has ... been bestowed upon the lowest elements of our population," Sanger worried that "reckless spawning carries with it the seeds of destruction." Pivot of Civilization 177-178.
Although Sanger believed that society was "indebted" to "the Eugenists" for diagnosing these problems, she did not believe that they had "show[n] much power in suggesting practical and feasible remedies." Id. , at 178. "As an advocate of Birth Control," Sanger attempted to fill the gap by showing that birth control had "eugenic and civilizational value." Propaganda 5. In her view, birth-control advocates and eugenicists were "seeking a single end"-"to assist the race toward the elimination of the unfit." Racial Betterment 11. But Sanger believed that the focus should be "upon stopping not only the reproduction of the unfit but upon stopping all reproduction when there is not economic means of providing proper care for those who are born in health." Ibid. (emphasis added). Thus, for Sanger, forced sterilization did *1788 "not go to the bottom of the matter" because it did not "touc[h] the great problem of unlimited reproduction" of "those great masses, who through economic pressure populate the slums and there produce in their helplessness other helpless, diseased and incompetent masses, who overwhelm all that eugenics can do among those whose economic condition is better." Id. , at 12. In Sanger's view, frequent reproduction among "the majority of wage workers" would lead to "the contributing of morons, feeble-minded, insane and various criminal types to the already tremendous social burden constituted by these unfit." Ibid.
Sanger believed that birth control was an important part of the solution to these societal ills. She explained, "Birth Control ... is really the greatest and most truly eugenic method" of "human generation," "and its adoption as part of the program of Eugenics would immediately give a concrete and realistic power to that science." Pivot of Civilization 189. Sanger even argued that "eugenists and others who are laboring for racial betterment" could not "succeed" unless they "first clear[ed] the way for Birth Control." Racial Betterment 11. If "the masses" were given "practical education in Birth Control"-for which there was "almost universal demand"-then the "Eugenic educator" could use "Birth Control propaganda" to "direct a thorough education in Eugenics" and influence the reproductive decisions of the unfit. Propaganda 5. In this way, "the campaign for Birth Control [was] not merely of eugenic value, but [was] practically identical in ideal with the final aims of Eugenics." Ibid.
Sanger herself campaigned for birth control in black communities. In 1930, she opened a birth-control clinic in Harlem. See Birth Control or Race Control? Sanger and the Negro Project, Margaret Sanger Papers Project Newsletter #28 (2001), http://www.nyu.edu/projects/sanger/articles/bc_or_race_control.php (all Internet materials as last visited May 24, 2019). Then, in 1939, Sanger initiated the "Negro Project," an effort to promote birth control in poor, Southern black communities. Ibid. Noting that blacks were " 'notoriously underprivileged and handicapped to a large measure by a "caste" system,' " she argued in a fundraising letter that " 'birth control knowledge brought to this group, is the most direct, constructive aid that can be given them to improve their immediate situation.' " Ibid. In a report titled "Birth Control and the Negro," Sanger and her coauthors identified blacks as " 'the great problem of the South' "-"the group with 'the greatest economic, health, and social problems' "-and developed a birth-control program geared toward this population. Ibid. She later emphasized that black ministers should be involved in the program, noting, " 'We do not want word to go out that we want to exterminate the Negro population, and the minister is the man who can straighten out that idea if it ever occurs to any of their more rebellious members.' " Ibid.
Defenders of Sanger point out that W. E. B. DuBois and other black leaders supported the Negro Project and argue that her writings should not be read to imply a racial bias. Ibid. ; see Planned Parenthood, Opposition Claims About Margaret Sanger (2016), https://www.plannedparenthood.org/uploads/filer_public/37/fd/37fdc7b6de5f-4d22-8c05-9568268e92d8/sanger_opposition_claims_fact_sheet_2016.pdf. But Sanger's motives are immaterial to the point relevant here: that "Birth Control" has long been understood to "ope[n] the way to the eugenist." Racial Betterment 12.
B
To be sure, Sanger distinguished between birth control and abortion. Woman and the New Race 128-129; see, e.g. , Sanger, Birth Control or Abortion? Birth Control Rev., Dec. 1918, pp. 3-4. For Sanger, "[t]he one means health and happiness-a stronger, better race," while "[t]he other means disease, suffering, [and] death." Woman *1789 and the New Race 129. Sanger argued that "nothing short of contraceptives can put an end to the horrors of abortion and infanticide," id. , at 25, and she questioned whether "we want the precious, tender qualities of womanhood, so much needed for our racial development, to perish in [the] sordid, abnormal experiences" of abortions, id. , at 29. In short, unlike contraceptives, Sanger regarded "the hundreds of thousands of abortions performed in America each year [as] a disgrace to civilization." Id. , at 126.
Although Sanger was undoubtedly correct in recognizing a moral difference between birth control and abortion, the eugenic arguments that she made in support of birth control apply with even greater force to abortion. Others were well aware that abortion could be used as a "metho[d] of eugenics," 6 H. Ellis, Studies in the Psychology of Sex 617 (1910), and they were enthusiastic about that possibility. Indeed, some eugenicists believed that abortion should be legal for the very purpose of promoting eugenics. See Harris, Abortion in Soviet Russia: Has the Time Come To Legalize It Elsewhere? 25 Eugenics Rev. 22 (1933) ("[W]e are being increasingly compelled to consider legalized abortion as well as birth control and sterilization as possible means of influencing the fitness and happiness and quality of the race"); Aims and Objects of the Eugenics Society, 26 Eugenics Rev. 135 (1934) ("The Society advocates the provision of legalized facilities for voluntarily terminating pregnancy in cases of persons for whom sterilization is regarded as appropriate"). Support for abortion can therefore be found throughout the literature on eugenics. E.g. , Population Control: Dr. Binnie Dunlop's Address to the Eugenics Society, 25 Eugenics Rev. 251 (1934) (lamenting "the relatively high birth-rate of the poorest third of the population" and "the serious rate of racial deterioration which it implied," and arguing that "this birth-rate ... would fall rapidly if artificial abortion were made legal"); Williams, The Legalization of Medical Abortion, 56 Eugenics Rev. 24-25 (1964) ("I need hardly stress the eugenic argument for extending family planning"-including "voluntary sterilization" and "abortion"-to "all groups, not merely to those who are the most intelligent and socially responsible").
Abortion advocates were sometimes candid about abortion's eugenic possibilities. In 1959, for example, Guttmacher explicitly endorsed eugenic reasons for abortion. A. Guttmacher, Babies by Choice or by Chance 186-188 (1959). He explained that "the quality of the parents must be taken into account," including "[f]eeble-mindedness," and believed that "it should be permissible to abort any pregnancy ... in which there is a strong probability of an abnormal or malformed infant." Id. , at 198. He added that the question whether to allow abortion must be "separated from emotional, moral and religious concepts" and "must have as its focus normal, healthy infants born into homes peopled with parents who have healthy bodies and minds." Id. , at 221. Similarly, legal scholar Glanville Williams wrote that he was open to the possibility of eugenic infanticide, at least in some situations, explaining that "an eugenic killing by a mother, exactly paralleled by the bitch that kills her misshapen puppies, cannot confidently be pronounced immoral." G. Williams, Sanctity of Life and the Criminal Law 20 (1957). The Court cited Williams' book for a different proposition in *1790 Roe v. Wade , 410 U. S. 113, 130, n. 9, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).
But public aversion to eugenics after World War II also led many to avoid explicit references to that term. The American Eugenics Society, for example, changed the name of its scholarly publication from "Eugenics Quarterly" to "Social Biology." See D. Paul, Controlling Human Heredity: 1865 to the Present, p. 125 (1995). In explaining the name change, the journal's editor stated that it had become evident that eugenic goals could be achieved "for reasons other than eugenics." Ibid. For example, "[b]irth control and abortion are turning out to be great eugenic advances of our time. If they had been advanced for eugenic reasons it would have retarded or stopped their acceptance." Ibid. But whether they used the term "eugenics" or not, abortion advocates echoed the arguments of early 20th-century eugenicists by describing abortion as a way to achieve "population control" and to improve the "quality" of the population. One journal declared that "abortion is the one mode of population limitation which has demonstrated the speedy impact which it can make upon a national problem." Notes of the Quarter: The Personal and the Universal, 53 Eugenics Rev. 186 (1962). Planned Parenthood's leaders echoed these themes. When exulting over " 'fantastic ... progress' " in expanding abortion, for example, Guttmacher stated that " 'the realization of the population problem has been responsible' for the change in attitudes. 'We're now concerned more with the quality of population than the quantity.' " Abortion Reforms Termed "Fantastic," Hartford Courant, Mar. 21, 1970, p. 16.
Avoiding the word "eugenics" did not assuage everyone's fears. Some black groups saw " 'family planning' as a euphemism for race genocide" and believed that "black people [were] taking the brunt of the 'planning' " under Planned Parenthood's "ghetto approach" to distributing its services. Dempsey, Dr. Guttmacher Is the Evangelist of Birth Control, N. Y. Times Magazine, Feb. 9, 1969, p. 82. "The Pittsburgh branch of the National Association for the Advancement of Colored People," for example, "criticized family planners as bent on trying to keep the Negro birth rate as low as possible." Kaplan, Abortion and Sterilization Win Support of Planned Parenthood, N. Y. Times, Nov. 14, 1968, p. L50, col. 1.
C
Today, notwithstanding Sanger's views on abortion, respondent Planned Parenthood promotes both birth control and abortion as "reproductive health services" that can be used for family planning. Brief in Opposition 1. And with today's prenatal screening tests and other technologies, abortion can easily be used to eliminate children with unwanted characteristics. Indeed, the individualized nature of abortion gives it even more eugenic potential than birth control, which simply reduces the chance of conceiving any child. As petitioners and several amicus curiae briefs point out, moreover, abortion has proved to be a disturbingly effective tool for implementing the discriminatory preferences that undergird eugenics. E.g. , Pet. for Cert. 22-26; Brief for State of Wisconsin et al. as Amici Curiae 19-25; Brief for Ethics and Religious Liberty Commission of the Southern Baptist Convention et al. as Amici Curiae 9-10.
In Iceland, the abortion rate for children diagnosed with Down syndrome in utero approaches 100%. See Will, The Down Syndrome Genocide, Washington Post, Mar. 15, 2018, p. A23, col. 1. Other European countries have similarly high rates, and the rate in the United States is approximately *1791 two-thirds. See ibid. (98% in Denmark, 90% in the United Kingdom, 77% in France, and 67% in the United States); see also Natoli, Ackerman, McDermott, & Edwards, Prenatal Diagnosis of Down Syndrome : A Systematic Review of Termination Rates (1995-2011), 32 Prenatal Diagnosis 142 (2012) (reviewing U. S. studies).
In Asia, widespread sex-selective abortions have led to as many as 160 million "missing" women-more than the entire female population of the United States. See M. Hvistendahl, Unnatural Selection: Choosing Boys Over Girls, and the Consequences of a World Full of Men 5-6 (2011); see also Kalantry, How To Fix India's Sex-Selection Problem, N. Y. Times, Int'l ed., July 28, 2017, p. 9 ("Over the course of several decades, 300,000 to 700,000 female fetuses were selectively aborted in India each year. Today there are about 50 million more men than women in the country"). And recent evidence suggests that sex-selective abortions of girls are common among certain populations in the United States as well. See Almond & Sun, Son-Biased Sex Ratios in 2010 U. S. Census and 2011-2013 U. S. Natality Data, 176 Soc. Sci. & Med. 21 (2017) (concluding that Chinese and Asian-Indian families in the United States "show a tendency to sex-select boys"); Almond & Edlund, Son-Biased Sex Ratios in the 2000 United States Census, 105 Proc. Nat. Acad. of Sci. 5681 (2008) (similar).
Eight decades after Sanger's "Negro Project," abortion in the United States is also marked by a considerable racial disparity. The reported nationwide abortion ratio- the number of abortions per 1,000 live births-among black women is nearly 3.5 times the ratio for white women. Dept. of Health and Human Services, Centers for Disease Control and Prevention, T. Jatlaoui et al., Abortion Surveillance-United States, 2015, 67 Morbidity and Mortality Weekly Report, Surveillance Summaries, No. SS-13, p. 35 (Nov. 23, 2018) (Table 13); see also Brief for Restoration Project et al. as Amici Curiae 5-6. And there are areas of New York City in which black children are more likely to be aborted than they are to be born alive-and are up to eight times more likely to be aborted than white children in the same area. See N. Y. Dept. of Health, Table 23: Induced Abortion and Abortion Ratios by Race/Ethnicity and Resident County New York State-2016, https://www.health.ny.gov/statistics/vital_statistics/2016/table23.htm. Whatever the reasons for these disparities, they suggest that, insofar as abortion is viewed as a method of "family planning," black people do indeed "tak[e] the brunt of the 'planning.' " Dempsey, supra , at 82.
Some believe that the United States is already experiencing the eugenic effects of abortion. According to one economist, " Roe v. Wade help[ed] trigger, a generation later, the greatest crime drop in recorded history." S. Levitt & S. Dubner, Freakonomics 6 (2005); see id. , at 136-144 (elaborating on this theory). On this view, "it turns out that not all children are born equal" in terms of criminal propensity. Id. , at 6. And legalized abortion meant that the children of "poor, unmarried, and teenage mothers" who were "much more likely than average to become criminals" "weren't being born." Ibid. (emphasis deleted). Whether accurate or not, these observations echo the views articulated by the eugenicists and by Sanger decades earlier: "Birth Control of itself ... will make a better race" and tend "toward the elimination of the unfit." Racial Betterment 11-12.
III
It was against this background that Indiana's Legislature, on the 100th anniversary *1792 of its 1907 sterilization law, adopted a concurrent resolution formally "express[ing] its regret over Indiana's role in the eugenics movement in this country and the injustices done under eugenic laws." Ind. S. Res. 91, 115th Gen. Assemb., 1st Sess., § 1 (2007); see Brief for Pro-Life Legal Defense Fund et al. as Amici Curiae 6-8. Recognizing that laws implementing eugenic goals "targeted the most vulnerable among us, including the poor and racial minorities, ... for the claimed purpose of public health and the good of the people," Ind. S. Res. 91, at 2, the General Assembly "urge[d] the citizens of Indiana to become familiar with the history of the eugenics movement" and "repudiate the many laws passed in the name of eugenics and reject any such laws in the future," id. , § 2.
In March 2016, the Indiana Legislature passed by wide margins the Sex-Selective and Disability Abortion Ban at issue here. Respondent Planned Parenthood promptly filed a lawsuit to block the law from going into effect, arguing that the Constitution categorically protects a woman's right to abort her child based solely on the child's race, sex, or disability. The District Court agreed, granting a preliminary injunction on the eve of the law's effective date, followed by a permanent injunction. A panel of the Seventh Circuit affirmed. Pointing to Planned Parenthood of Southeastern Pa. v. Casey , 505 U. S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), both the District Court and the Seventh Circuit held that this Court had already decided the matter: " Casey 's holding that a woman has the right to terminate her pregnancy prior to viability is categorical." Planned Parenthood of Indiana and Kentucky, Inc. v. Commissioner of Indiana State Dept. of Health , 888 F. 3d 300, 305 (CA7 2018) ; see Planned Parenthood of Indiana and Kentucky, Inc. v. Commissioner, Indiana State Dept. of Health , 265 F. Supp. 3d 859, 866 (SD Ind. 2017). In an opinion dissenting from the denial of rehearing en banc, Judge Easterbrook expressed skepticism as to this holding, explaining that " Casey did not consider the validity of an anti-eugenics law" and that judicial opinions, unlike statutes, "resolve only the situations presented for decision." Planned Parenthood of Indiana and Kentucky, Inc. v. Commissioner of Indiana State Dept. of Health , 917 F. 3d 532, 536 (CA7 2018).
Judge Easterbrook was correct. Whatever else might be said about Casey , it did not decide whether the Constitution requires States to allow eugenic abortions. It addressed the constitutionality of only "five provisions of the Pennsylvania Abortion Control Act of 1982" that were said to burden the supposed constitutional right to an abortion. Casey , supra , at 844, 112 S.Ct. 2791. None of those provisions prohibited abortions based solely on race, sex, or disability. In fact, the very first paragraph of the respondents' brief in Casey made it clear to the Court that Pennsylvania's prohibition on sex-selective abortions was "not [being] challenged," Brief for Respondents in Planned Parenthood of Southeastern Pa. v. Casey , O. T. 1991, Nos. 91-744, 91-902, p. 4. In light of the Court's denial of certiorari today, the constitutionality of other laws like Indiana's thus remains an open question.
The Court's decision to allow further percolation should not be interpreted as agreement with the decisions below. Enshrining a constitutional right to an abortion based solely on the race, sex, or disability of an unborn child, as Planned Parenthood advocates, would constitutionalize the views of the 20th-century eugenics movement. In other contexts, the Court has been zealous in vindicating the rights of people even potentially subjected to race, sex, and disability discrimination. Cf.
*1793 Pena-Rodriguez v. Colorado , 580 U. S. ----, ----, 137 S.Ct. 855, 868, 197 L.Ed.2d 107 (2017) (condemning "discrimination on the basis of race" as " 'odious in all aspects' "); United States v. Virginia , 518 U. S. 515, 532, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996) (denouncing any "law or official policy [that] denies to women, simply because they are women, ... equal opportunity to aspire, achieve, participate in and contribute to society based on their individual talents and capacities"); Tennessee v. Lane , 541 U. S. 509, 522, 124 S.Ct. 1978, 158 L.Ed.2d 820 (2004) (condemning "irrational disability discrimination").
Although the Court declines to wade into these issues today, we cannot avoid them forever. Having created the constitutional right to an abortion, this Court is dutybound to address its scope. In that regard, it is easy to understand why the District Court and the Seventh Circuit looked to Casey to resolve a question it did not address. Where else could they turn? The Constitution itself is silent on abortion.
With these observations, I join the opinion of the Court.

Justice GINSBURG's dissent from this holding makes little sense. It is not a " 'waste' " of our resources to summarily reverse an incorrect decision that created a Circuit split. Post , at 1793. And Justice GINSBURG does not even attempt to argue that the decision below was correct. Instead, she adopts Chief Judge Wood's alternative suggestion that regulating the disposition of an aborted child's body might impose an "undue burden" on the mother's right to abort that (already aborted) child. See post , at 1793. This argument is difficult to understand, to say the least-which may explain why even respondent Planned Parenthood did not make it. The argument also lacks evidentiary support. See Planned Parenthood of Indiana and Kentucky, Inc. v. Commissioner of Indiana State Dept. of Health , 917 F. 3d 532, 538 (CA7 2018) (en banc) (Easterbrook, J., dissenting).

See, e.g. , Ariz. Rev. Stat. Ann. § 13-3603.02 (2018) (sex and race); Ark. Code § 20-16-1904 (2018) (sex); Kan. Stat. Ann. § 65-6726 (2017) (sex); La. Rev. Stat. Ann. § 40:1061.1.2 (2019) (genetic abnormality); N. C. Gen. Stat. § 90-21.121 (2017) (sex) ; N. D. Cent. Code Ann. § 14-02.1-04.1 (2017) (sex and genetic abnormality); Ohio Rev. Code Ann. § 2919.10 (2018) (Down syndrome ); Okla. Stat., Tit. 63, § 1-731.2(B) (2016) (sex); 18 Pa. Cons. Stat. § 3204(c) (2015) (sex); S. D. Codified Laws § 34-23A-64 (2018) (sex). My focus on a State's compelling interest in prohibiting eugenics in abortion does not suggest that States lack other compelling interests in adopting these or other abortion-related laws.

The finding that Buck was "feeble minded" was apparently wrong. See P. Lombardo, Three Generations, No Imbeciles: Eugenics, the Supreme Court, and Buck v. Bell 277 (2008) (arguing that "the case was a sham"); see Imbeciles 15-35 (arguing that Buck had perfectly normal intelligence and no medical records of any disability).

Both eugenics and disparate-impact liability rely on the simplistic and often faulty assumption that "some one particular factor is the key or dominant factor behind differences in outcomes" and that one should expect "an even or random distribution of outcomes ... in the absence of such complicating causes as genes or discrimination." Sowell 25, 87. Among other pitfalls, these assumptions tend to collapse the distinction between correlation and causation and shift the analytical focus away from "flesh-and-blood human being[s]" to impersonal statistical groups frozen in time. Id. , at 83; see id. , at 87-149 (explaining how statistics and linguistics can be used to obscure realities). Just as we should not assume, based on bare statistical disparities, "that the Negro lacks in his germ-plasm excellence of some qualities which the white races possess," Applied Eugenics 285, "[w]e should not automatically presume that any institution with a neutral practice that happens to produce a racial disparity is guilty of discrimination until proved innocent." Texas Dept. of Housing and Community Affairs v. Inclusive Communities Project, Inc. , 576 U. S. ----, ----, 135 S.Ct. 2507, 2530, 192 L.Ed.2d 514 (2015) (THOMAS, J., dissenting). Both views "ignore the complexities of human existence." Id. , at ----, 135 S.Ct., at 2530.